IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2003 Session

## STATE OF TENNESSEE v. GREGORY LANCE

**Direct Appeal from the Criminal Court for Putnam County**
**No. 99-0054      Charles Lee, Judge**

---

**No. M2001-02507-CCA-R3-CD - Filed April 28, 2003**

---

Defendant, Gregory Lance, appeals his convictions in the Putnam County Criminal Court for two counts of first degree premeditated murder, especially aggravated burglary, and arson. For the first degree murder convictions, the trial court imposed two concurrent sentences of life imprisonment. For the especially aggravated burglary conviction and arson conviction, Defendant was sentenced to serve eight years and three years respectively, to be served concurrently with his life sentences. In this direct appeal, Defendant argues: (1) he received ineffective assistance of counsel at trial; (2) the trial court erred in denying his requested jury instruction regarding circumstantial evidence; and (3) there was insufficient evidence to support his convictions. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Michael D. Galligan and John P. Partin, McMinnville, Tennessee (on appeal) and David Neal Brady, District Public Defender; Marshall Judd, Assistant Public Defender; and John B. Nisbet, III, Assistant Public Defender, Cookeville, Tennessee (at trial) for the appellant, Gregory Lance.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William Edward Gibson, District Attorney General; David Patterson, Assistant District Attorney General; and Benn Fann, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In the early morning hours of August 5, 1998, Victor and Alla Kolesnikow were shot and killed inside their home, and their house was burned. James Redman testified that on August 5, 1998, at around 3:00 a.m., he was awakened by the sound of a large explosion. From his bedroom window, he saw flames coming from the victims' house across the street. He saw a car "tearing down the driveway" and driving away in the direction of town. He did not observe the vehicle's

color, make, or model, and he could not give a description of the driver. He described the car only as having been very loud. Mr. Redman's wife called 911.

The victims sold their mobile home park to Defendant in 1996, and they held a second mortgage in the amount of $335,000. Because Defendant failed to pay the insurance premiums and real estate taxes on the property, they initiated foreclosure proceedings. Defendant filed bankruptcy on May 22, 1998, which automatically stayed the foreclosure sale. The victims filed a motion to lift the stay. A final hearing on the victims' motion to lift the automatic stay was scheduled for August 7, 1998, two days following the victims' murders.

Dr. Charles Harlan performed the autopsies on the victim's bodies. He testified that Mrs. Kolesnikow's cause of death was three gunshot wounds to the head. Mr. Kolesnikow's cause of death was gunshot wounds to the head, chest, and abdomen. Both victims were identified using their dental records, and their bodies were "charred." Dr. Harlan recovered three bullet fragments from Mr. Kolesnikow's head.

Phillip Gentry, a bomb and arson investigator for the State Fire Marshall's office, arrived at the victims' home at around 6:00 a.m. on August 5, 1998. He testified that Mrs. Kolesnikow's body was found lying face up on the bed, and there was blood on her pillow underneath her head. Mr. Kolesnikow's body was found lying on the floor beside the bed. Investigator Gentry smelled a strong odor of gasoline on and around Mr. Kolesnikow's body. He found a plastic gas container in the yard of the home. He also found several projectiles and casings in the bedroom.

Robert Pollard, a bomb and arson investigator from the State Fire Marshall's office, testified that dogs detected a fire accelerant on and near the victims' bodies. He also collected several items of fire debris from the scene and placed them in evidence cans. Investigator Pollard recovered three bullet projectiles and seven shell casings from the home.

Bob Kroffsik, a TBI criminal investigator, interviewed Defendant around 12:30 or 1:00 p.m. on August 5, 1998. He gave Defendant's shoes and socks to Agent Pollard to be tested for the presence of accelerants.

TBI forensic scientist Sandra Evans received evidence from Investigator Pollard on August 6, 1998. She analyzed the items for the presence of ignitable liquids. Her analysis revealed the presence of a gasoline range product on debris found around the victims' bodies. The analysis of Defendant's shoes and socks revealed the presence of a gasoline range product and toluene, a solvent used in glues. Ms. Evans also tested the red plastic gas container found at the victims' home, and detected the presence of gasoline. Ms. Evans testified that gasoline usually evaporates in five to seven days. The gasoline detected on Defendant's shoes and socks was partially evaporated.

James A. Tucker, Sr., Defendant's stepfather, testified that he had conversations with Defendant about the bankruptcy proceedings, and Defendant did not appear to be upset. Mr. Tucker testified that Defendant's truck spews gas when it is being filled. Katrina Wright, Defendant's

former girlfriend, testified that he kept gasoline powered equipment in his garage, and gasoline sometimes spilled on the garage floor.

Investigator Pollard shaved hair from the back of Defendant's hands and found that it appeared to be singed. He did not see any burns on Defendant, and Defendant's facial hair did not appear to be singed. FBI hair analyst Karen Lanning examined the hair shaved from the backs of Defendant's hands and found that the ends of the hair were burned. Ms. Lanning testified that the condition of the hairs was consistent with hairs singed by the flash of a gasoline ignition.

James Bohannon lives on the same road about one mile closer to town from where the victims lived. In September of 1998, he found a gun on his property. A green cord was attached to the gun. There was a small black flashlight taped to the barrel of the gun. Bohannon found the gun lying at the top of an embankment, on the right side of the road if traveling from his residence, towards the city of Cookeville, and away from the victims' home.

Detective Gary Roach of the Putnam County Sheriff's Department testified that on September 17, 1998, he went to Bohannon's residence to recover the Tech 9, nine millimeter gun. He emptied a round of ammunition from the chamber of the gun and took out the magazine. The gun had a cord and a flashlight attached to it. No latent fingerprints were found on the gun or the flashlight. TBI forensic scientist Elizabeth Reed was unable to match two prints on the flashlight batteries with prints from Defendant, Erik Anderson, Michael Snow, or Lee Gabbard. No fingerprint analysis was done on Keith Herbstreith.

Robert Sheppard owned Sheppard's Auto Sales. He identified the gun found on Mr. Bohannon's farm as one that was traded in by a customer. Sheppard believed the gun was stolen in a robbery on January 20, 1997, however, the gun's serial number was not listed on the police report of items stolen. He had stored the gun in a plastic box in a filing cabinet.

TBI firearms forensic scientist Terry Arney examined the weapon. She described the weapon as a semi-assault, semi-automatic pistol. From test firing the weapon, Ms. Arney determined that it was in working order and that the bullets and shell casings recovered from the victims' home had been fired from it. One bullet recovered from one of the victim's bodies also matched the weapon.

Michael Snow testified that he worked with Defendant in the early summer of 1998. Defendant approached him in April, 1998, and told him that his property was being foreclosed upon and that he was going to file bankruptcy. Defendant expressed to Snow his desire to have the victims killed. Snow told Defendant that he could not kill the victims himself, but he might know someone who would. Snow testified that he dealt drugs and sometimes collected money from people by using force or violence. Defendant gave Snow $2,500 and told him to "get the ball rolling." Snow told Defendant that it would cost $10,000. Defendant told him to give back the money and that he could find someone else to do it for less. Snow also testified that in June of 1998, Defendant approached him and asked if he could get him a stolen gun. Snow told him that he could not.

Rocky Harmon testified that he had known Defendant for fourteen years. In June of 1998, Defendant asked him how much he thought it would cost to have someone killed. Harmon told him that it would cost $10,000. Harmon called Defendant in August of 1998 and asked if he had taken care of his problem. Harmon testified that he was referring to a resident at the trailer park who had not been paying rent. Defendant told Harmon that he could not talk to him because he believed that his phone was being tapped. Harmon later saw Defendant in person, and Defendant instructed him to keep his mouth shut and not to talk to police. In reference to his then girlfriend, who Defendant later married, Defendant told Harmon that a wife cannot testify against her husband. On cross-examination, Harmon testified that he was taking several medications and had been in ten mental hospitals in the last three years. He testified that he had split personalities. He was "pretty sure" that he was himself and not one of his other personalities when talking to Agent Kroffsik after the murders. He also testified that he was intoxicated when he had the conversation with Defendant about having someone killed for $10,000.

Erik Tanner testified that he knew Defendant from the National Guard. He worked with Defendant in construction, and lived with Defendant and four others in a house at Defendant's trailer park. Two or three weeks prior to the murders, Defendant asked Tanner where he could get a stolen gun. Two or three weeks after the murders, Defendant and Tanner went to Phoenix, Arizona, to perform some construction work for Mike Herron. Defendant told Tanner not to tell anyone that they were going. Tanner returned to Cookeville before Defendant, and Defendant instructed him not to stay at his house and to avoid the TBI.

Tanner recognized the green cord tied to the gun found at Mr. Bohannon's house from the swing in the front yard of the house he shared with Defendant. Tanner also testified that he recognized the small black flashlight attached to the gun from Defendant's truck. On cross-examination, he testified that Keith Herbstreith had broken the swing that was attached using the green cord, and that he remembered seeing a flashlight similar to the one attached to the gun in Herbstreith's boat. He also told investigators after the murders that he had seen Defendant at around 1:30 a.m. on the night of the murders.

Twelve-year old Steven England lived in Defendant's trailer park in August of 1998. He testified that he found some green cord at Defendant's house and gave it to Agent Kroffsik. He also testified on cross-examination that he saw Keith Herbstreith with the green cord once or twice. TBI trace evidence forensic scientist Linda Littlejohn compared the cord from Defendant's yard with the cord found on the gun. She concluded that the cords were consistent and could have a common origin.

Mary Hopson worked at the Stor-N-Lock in Cookeville in August of 1998. On August 3, 1998, Defendant rented a storage unit from her. She asked him several personal questions for the leasing contract, and she felt that he was evasive and suspicious. Defendant was given an access code to get in and out of the facility. The unit was accessed several times between August 3, 1998, and August 9, 1998. On August 10, 1998, Ms. Hopson found Defendant's storage unit unlocked and

empty. The security code is unique to each storage unit, but there is nothing to prevent a renter from giving his code to another person.

Keith Herbstreith testified that he lived with Defendant and managed Defendant's trailer park. He noticed a personality change in Defendant about two or three months before the murders. Defendant was frustrated about the foreclosure and told Herbstreith that he was upset that the victims were taking his home and his livelihood. Three weeks prior to the murders, Defendant asked Herbstreith if he knew anyone who could kill the victims for hire. Herbstreith did not take Defendant seriously. In a second conversation, about one week before the victims' deaths, Defendant asked Herbstreith if he had found anyone to kill the victims, and Herbstreith told him that he had not and that Defendant could "beat them in court." Defendant said, "No. I am going to have to kill them." Herbstreith told Defendant that he thought that was "a really bad idea."

Herbstreith was interviewed by TBI agents on August 5, 1998, and again in September of 1998. He gave conflicting interviews. He testified that the first interview was in Defendant's presence and he "feared for his life." During the second interview, Defendant was in Arizona. Herbstreith testified that when he informed Defendant about the victims' deaths, Defendant responded, "Well, imagine that."

Herbstreith testified that there was a fifty-five gallon drum behind their house, which they used to burn trash and leftover construction lumber. He saw Defendant empty trash from his truck into the barrel and burn it on either August 4 or August 5, 1998. He told Agent Kroffsik during an interview on August 5, 1998, that he and another worker picked up trash around the house and driveway and burned it the day before.

Herbstreith further testified that on August 2, 1998, Defendant was driving Dave Anderson's car, a small red car with Humphreys County license plates. Defendant told Herbstreith that he was going to shoot guns on Mike Herron's farm that day. Jerry Gardner saw Defendant practicing target shooting at the Herron farm between 3:00 and 4:00 p.m. on August 2, 1998. Gardner also saw the small red car.

Joel Brown testified that he owned some property adjoining Mike Herron's property in Rickman, Tennessee. He lived there in August of 1998. On August 2, 1998, Brown heard shooting. He drove up the road and saw a small red car parked behind a garage structure on Mike Herron's property. Brown identified the car he saw at the Herron farm that day as Dave Anderson's car. Later that same evening, Brown went to Mike Herron's property again to look for empty shells. He looked inside the barn and found two plastic five gallon cans of gasoline that he had not seen there the day before. After seeing the gas cans, a concerned Brown called neighbor Steve Powell. They checked on the gas cans for the next two days. The gas cans remained in the barn until the evening of August 4, 1998, and when Brown checked again on the morning of August 5, 1998, they were no longer there.

Brown testified that on August 4, 1998, at around 8:30 p.m., he observed a U-haul truck parked behind the garage. He saw a man sitting inside the truck with the door open and the tailgate raised. Steve Powell described the person as a large white male in excess of 180 pounds.

On August 4, 1998, at around 4:30 or 5:00 p.m., Brown heard two people at the Herron farm, and he heard a chainsaw. He also saw smoke coming from Herron's property. The next morning, he went over to the Herron property to see what had been burning. He found bullets lying in the coals and ashes, which were still warm.

TBI Agent Russ Winkler testified that on August 24, 1998, he called Mike Herron at a motel in Arizona to obtain his consent to search his property in Rickman, Tennessee. Herron gave his consent to search the property. On August 27, 1998, he called Herron again at the same location in Arizona and told him that the TBI had searched the property and was conducting a homicide investigation. Agent Winkler testified that there was a tree on Herron's property that appeared to have been used for target practice. The TBI removed a section of the tree and sent it to the TBI crime laboratory to have any projectiles removed and examined.

Investigator Johnny Hayes of the State Fire Marshall's office collected evidence from the Herron farm on August 26, 1998, using a dog trained in sniffing out bullets and casings. He recovered twenty-three bullets and projectiles. Four bullets and one shell casing recovered by Hayes at the Herron farm were matched with the murder weapon by TBI forensic scientist Terry Arney. Investigator Hayes also observed that a section of wall on the west side of one of the buildings had been freshly cut out.

Brian Brinker and Marlon Ray stopped at the Heron farm at the end of August of 1998, in a blue and white truck to inquire about renting the house. They saw smoke coming from the barn area. Brinker and Ray both identified Defendant from photograph lineups as the person burning dresser drawers.

Mike Herron worked for Defendant for about one year. He moved to his farm in Rickman in 1996. Defendant visited the farm on several occasions and had worked with Herron. Defendant and Herron would sometimes target shoot on the property. Herron moved to California in February, 1998. Herron learned of the Kolesnikows' murders from Joel Brown. On August 24, 1998, Herron received a phone call from Agent Winkler, who indicated that there had been some damage to Herron's property. Agent Winkler was seeking permission to search his farm. Herron was staying in Arizona at the time, working on a construction project. He called Defendant from Arizona on August 25, 1998, to inquire about his availability for a job. Herron also contacted Defendant to request that he check on his property because he had learned from Agent Winkler that some criminal activity had taken place there. Defendant, Dave Anderson, and Erik Tanner went to Arizona to work for Herron in late August of 1998. Defendant stayed until he received a phone call from Keith Herbstreith, informing him that he was leaving and could no longer manage the trailer park.

Erik Tanner testified that at around 9:30 p.m. on August 4, 1998, Defendant's then girlfriend, Becky Pollard, arrived home intoxicated. Upset because she did not know Defendant's whereabouts, she had sex with Tanner on the porch. Tanner fell asleep on the sofa at around 11 p.m. He awoke around 12:30 p.m. and saw Defendant. Defendant was wearing a shirt, shorts, and sneakers. Tanner saw Defendant again the next morning between 7:00 and 8:00 a.m., and Defendant was wearing the same clothes.

Mike and Susan Horn, the victims' neighbors, saw an older model sky blue Buick in the neighborhood on August 4, 1998. Two men were in the vehicle. At 7 p.m., the car was near the victims' home. At around 11 p.m., the car was parked across the street and down the road from the victim's home, but no one was inside the vehicle.

Becky Pollard married Defendant a few days after the murders. She was seventeen. She testified that Defendant came home around 1:30 a.m. on the morning of August 5, 1998. She was awake when he arrived home, and she heated his dinner in the microwave and sat with him while he ate. Defendant then took a shower, and they went to sleep. Ms. Lance testified that because they slept in a waterbed, Defendant would have awakened her had he gotten up and left in the middle of the night. Defendant did not testify in his own defense.

**Ineffective Assistance of Counsel**

In this direct appeal, Defendant contends that he received ineffective assistance of counsel at trial. Defendant argues that his trial counsel was ineffective because: (1) counsel failed to timely and adequately prepare for trial and asked for repeated continuances over Defendant's objection; (2) counsel failed to interview, properly prepare and subpoena witnesses prior to trial; (3) counsel failed to adequately prepare for and present the testimony of Billy Cleghorn, resulting in a sustained hearsay objection to his testimony; (4) counsel failed to adequately prepare for the admission into evidence of an arrest warrant against Michael Parkes; (5) counsel failed to adequately prepare for the testimony of Sandy Evans, an expert witness for the State, based on the erroneous assumption that she would be excluded from testifying because the State inadvertently omitted her from its witness list; (6) counsel failed to retain expert witnesses to rebut the State's expert witnesses and failed to adequately cross-examine the State's expert witnesses; (7) counsel failed to adequately communicate with Defendant regarding trial strategy and give Defendant reasonable opportunity to inspect the State's evidence against him; (8) counsel failed to prepare Defendant to testify.

This court has previously cautioned that ineffective assistance of counsel claims are best pursued in a petition for post-conviction relief. Once this court addresses the merits of such a claim on direct appeal, the issue may not be revisited in a post-conviction petition. *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992).

Both the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee a defendant's right to representation by counsel. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). This

right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674, 692 (1984).

To succeed on a claim of ineffective assistance of counsel, a defendant bears the burden of showing by clear and convincing evidence that the services rendered by trial counsel were deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; *Dean v. State*, 59 S.W.3d 663, 667 (Tenn. 2001). In order to demonstrate a deficient performance, the defendant must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter*, 523 S.W.2d at 936. In order to demonstrate prejudice, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. We need not address whether counsel's performance was deficient if the defendant makes an insufficient showing of prejudice suffered as a result of the alleged deficiency. *Id.*, 466 U.S. at 697, 104 S. Ct. At 2069, 80 L. Ed. 2d at 699.

"When addressing an attorney's performance it is not our function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). "The fact that a particular tactic or strategy failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Id.*

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Burns*, 6 S.W.3d at 461. Questions concerning the credibility of the witnesses, the weight to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. *Henley*, 960 S.W.2d at 579. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *See Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The trial court's conclusions of law, however, are reviewed *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

Defendant asserted ineffective assistance of counsel in his amended motion for new trial. When a defendant alleges ineffective assistance of counsel in a motion for new trial, the hearing on the motion is essentially transformed into a post-conviction proceeding. *State v. Ricky Brandon and Jimmy W. Brandon*, 2002 Tenn. Crim. App. LEXIS 864, No. M2002-00073-CCA-R3-CD (Tenn. Crim. App. at Nashville, October 15, 2002), *perm. to app. denied* (Tenn. Feb. 24, 2003). In a post-conviction hearing, the defendant bears the burden of proving the allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997).

At the hearing on Defendant's motion for new trial, Defendant testified regarding his decision not to testify. Neither of the attorneys who represented Defendant at trial testified at the hearing. In its order denying Defendant's motion for new trial, the trial court concluded that the advice given

and the services rendered by Defendant's trial counsel were within the range of competence demanded of attorneys in criminal cases.

*Failure to Adequately Prepare for Trial*

First, Defendant complains that trial counsel failed to adequately prepare for trial and requested several continuances, causing unnecessary delay and violating his constitutional right to a speedy trial. Defendant did not allege this deficiency in his motion for new trial, and it is therefore waived. Tenn. R. App. P. 3(e). Even if we address the issue on the merits, we conclude that Defendant has not established that he was prejudiced by the delay.

In determining whether a defendant's right to a speedy trial was violated, courts must balance the following factors: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the delay caused any prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101, 117 (1972); *State v. Bishop*, 493 S.W.2d 81, 84 (Tenn. 1973).

Defendant was indicted on two counts of first degree murder on February 22, 1999. Defendant was arrested on April 6, 1999. A superseding indictment was filed on May 17, 1999, to include charges of aggravated arson and especially aggravated burglary. Defendant's trial began on October 10, 2000. Defendant contends that a delay of eighteen months between arrest and trial is presumptively prejudicial. We will not presume prejudice, however, from that fact alone. A delay of this length merely triggers further inquiry. *See Bishop*, 493 S.W.2d at 85 (A delay of two years was not enough to presume prejudice.).

Shortly after his arrest, Defendant hired attorney John B. Nisbet, III, to represent him at trial. At a hearing to set Defendant's bond on August 13, 1999, the trial date was set for January 31, 2000. On December 20, 1999, the trial court granted Mr. Nisbet's request for a continuance. Mr. Nisbet asked that the case be continued because he was preparing to leave the country. No other reason was given. The trial date was then set for May 22, 2000. On February 24, 2000, the trial court appointed Assistant Public Defender H. Marshall Judd to assist in Defendant's representation. On May 11, 2000, less than three months after being appointed to represent Defendant, Mr. Judd requested a continuance, which the trial court granted. Mr. Judd informed the court that the defense was not prepared for trial, citing the need for a mental evaluation and additional discovery.

Defendant clearly asserted his right to a speedy trial. At the May 11, 2000, hearing, Defendant expressed his objection to another continuance in open court. The trial court acknowledged Defendant's objection, but found that the benefits of additional time in which to prepare for trial outweighed Defendant's desire for a speedy trial. At a hearing conducted on September 29, 2000, Defendant again expressed his concerns regarding the long delay in going to trial. The trial court recognized that the case had been delayed for an inordinately long time, but held that the issue was then moot because the trial was set to begin only eleven days later. While a

defendant's specific request for a speedy trial is an important factor, it will not alone support a finding that the defendant has been denied a speedy trial. *Bishop*, 493 S.W.2d at 85.

Defendant concedes that in most cases involving an assertion of a violation of a defendant's right to a speedy trial, the delay is caused by the State's negligence or misconduct, rather than by defense counsel. It is unusual for a defendant to allege that his own attorneys, rather than the State, denied him the right to a speedy trial. This is because a delay at the request of defense counsel often favors the defendant. Mr. Nisbet represented Defendant for eight months before the appointment of Mr. Judd. Considering the seriousness of the charges against Defendant, a delay of that length is not unreasonable. Additional time was needed in order to prepare an adequate defense to charges of first degree murder, aggravated arson, and especially aggravated burglary. Defendant has not shown that the delay hindered, rather than helped, his defense.

Defendant alleges that many of the witnesses whom Defendant requested be interviewed were residents of the trailer park at which Defendant lived. Defendant argues that "trailer park residents are often transient," and "memories fade over a period of 18 months." Defendant does not offer the names of any of those witnesses or the testimony that those witnesses would have given. Without more proof, Defendant has not established prejudice. Furthermore, the delay does not prove the ineffectiveness of defense counsel.

*Failure to Interview and Subpoena Witnesses for Trial*

Next, Defendant complains that trial counsel failed to interview several witnesses. Trial counsel hired private investigator Ron Lax to assist in the preparation of the defense. At the hearing on Defendant's motion for new trial, Defendant testified that he requested the reports of all the interviews of witnesses conducted by Mr. Lax, and he never received them. Defendant was concerned that Mr. Lax had not interviewed the witnesses suggested by Defendant. When asked which witnesses Mr. Lax and trial counsel failed to interview, Defendant responded that they should have interviewed the members of the grand jury. He testified that Mr. Lax "definitely should interview the grand jury in this case because it was my understanding that Mr. Kroffsik was going around telling people that my fingerprints were all over the murder weapon." Defendant did not give any other examples of potential witnesses who were not interviewed in preparation for trial.

Ron Lax testified that he worked more than 500 hours on the investigation for the defense, and he met with Defendant on fourteen occasions prior to the commencement of trial. Mr. Lax provided Defendant with time lines, which summarized all of the investigation conducted in chronological order.

Defendant argues that trial counsel was ineffective for failing to proffer the testimony of two witnesses whose testimony would have implicated Sam and Peggy Horn, the victims' neighbors, in the victims' murders. Defendant argues that trial counsel failed to interview Chris Henry, who testified at the hearing on the motion for new trial that Sam Horn told him that the victims had threatened to turn him in to the police for manufacturing crystal meth if he did not catch up in his

payments on his house. Horn told Henry that if the victims "snitched" on him, he would "knock on their front door, shoot them, and burn their house down behind him and leave." After the victims were killed, Horn told Henry that "he took care of the problem." Henry also testified that he had seen a Tech 9 gun in Horn's house.

The trial court ruled, in its order denying Defendant's motion for new trial, that Henry's testimony would have been inadmissible hearsay at trial because Defendant did not present any evidence that Sam and Peggy Horn were unavailable as witnesses. *See* Tenn. R. Evid. 804(b)(3).

Defendant argues that trial counsel was ineffective for failing to overcome a hearsay objection by the State to the testimony of Billy Cleghorn. Cleghorn told TBI investigators that he arrived at the home of Sam and Peggy Horn, who lived next door to the victims, between 3:30 and 4:30 a.m. on August 5, 1999, the morning of the murders. When he arrived, the victims' house was on fire. Mr. Horn met Cleghorn in the driveway and told him that he should leave because the police were coming.

In this appeal, Defendant argues that trial counsel was ineffective for failing to present proof that Sam and Peggy Horn were unavailable as witnesses at trial. At trial, the court ruled that Billy Cleghorn's testimony was inadmissible hearsay based on this court's holding in *Newsome v. State*, 995 S.W.2d 129 (Tenn. Crim. App. 1998). The trial court quoted that opinion:

> [H]earsay evidence is not legal evidence and is not admissible to show that someone other than the accused committed the offense at issue. A defendant may disprove his guilt by proving the guilt of some other person; but, this must be done with legal evidence and not by the testimony of witnesses who heard another admit that he committed the offense.

*Newsome v. State*, 995 S.W.2d at 135.

Appellate counsel failed to present any evidence at the hearing on the motion for new trial that Sam and Peggy Horn were unavailable at trial, and therefore Defendant has failed to demonstrate prejudice. *See* Tenn. R. Evid. 804(b)(3).

Defendant also relies on the trial transcript, in which his trial counsel commented during the cross-examinations of several of the State's witnesses that he had never met with or spoken to those witnesses. The trial court found that Mr. Lax interviewed most of the witnesses who testified at trial and presented his findings to trial counsel, and Defendant has not established otherwise, nor has Defendant indicated how those witnesses' testimony would have been different if defense counsel had personally interviewed them. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (recognizing that a failure to call a witness at a hearing on ineffective counsel prevents defendant from showing prejudice). Again, Defendant has failed to prove prejudice.

*Arrest Warrant*

Next, Defendant complains that trial counsel was ineffective for failing to succeed on his attempt to admit into evidence an arrest warrant sworn out by Victor Kolesnikow against Michael Parkes on September 5, 1997, alleging that Parkes committed an aggravated assault on Mr. Kolesnikow. At trial, defense counsel argued that the arrest warrant should be admitted under the public records exception of Tennessee Rule of Evidence 803, and to show the state of mind of the deceased declarant, Victor Kolesnikow. The trial court ruled that the warrant was inadmissible because it was sworn out over one year prior to the murders, and the confusion created would outweigh the probative value of the evidence pursuant to Tennessee Rule of Evidence 403.

Defendant argues that trial counsel promised the jury during opening statements that there were "other suspects in this case, a lot of people who did not like Victor Kolesnikow who had threatened his life, who had warrants taken out against them by Victor Kolesnikow." This court has warned against the potential adverse effects of failing to present evidence promised during opening statements. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Defendant did not present any proof, however, at the hearing on the motion for new trial that the warrant would have been admissible at trial or demonstrate how the unfulfilled promise prejudiced his defense.

*Witness Sandra Evans*

Next, Defendant complains that trial counsel was ineffective for failing to adequately prepare for the testimony of Sandra Evans, an expert witness called by the State to testify about the presence of gasoline on Defendant's shoes and socks. Trial counsel argued for the exclusion of Ms. Evans' testimony based on the State's failure to include her on its witness list. The trial court admitted her testimony, finding that the State's omission was inadvertent. Defendant argues that trial counsel was ineffective for erroneously relying on the State's omission. Defendant also argues, in this appeal, that defense counsel did not cite authority in his argument to the trial court for the exclusion of Ms. Evans' testimony.

At trial, in a jury-out hearing to determine whether the State's omission was inadvertent or deliberate and whether Defendant was prejudiced by the omission, defense counsel told the trial court that "No amount of preparation with Ms. Evans is going to cure the strategic decisions we have made to get us to this point." Mr. Nisbet argued that he would have called an expert to rebut her testimony had he known she would be allowed to testify. On cross-examination by the assistant district attorney, Mr. Nisbet testified that the investigator, Mr. Lax, had interviewed Ms. Evans and had prepared a written report of the interview, which was received by Mr. Nisbet. The trial court commented, "Obviously the exclusion of the evidence is far better than the explanation of it." Although defense counsel argued for the exclusion of Ms. Evans' testimony, the trial court properly admitted her testimony, and defense counsel adequately prepared for her cross-examination. Defense counsel's performance was not deficient with regard to the preparation for the testimony of witness Sandra Evans. Furthermore, Defendant has not shown prejudice. Again, no evidence was presented in support of this allegation at the hearing on the motion for new trial. The State's failure to provide

the names of witnesses does not entitle the defendant to relief unless prejudice can be shown. *State v. Morris*, 750 S.W.2d 746 (Tenn. Crim. App. 1987). Defense counsel attempted to show prejudice by arguing to the trial court that there was not enough time in which to call an expert witness to rebut Ms. Evans' testimony. At the hearing on the motion for new trial, however, Defendant did not proffer the testimony of any expert witnesses. Defendant has failed to show prejudice.

*Expert Witnesses*

Next, Defendant complains that trial counsel was ineffective for failing to call any expert witnesses to rebut the State's evidence. Defendant did not, however, produce any expert witnesses at the hearing on the motion for new trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Defendant has failed to show prejudice.

*Inadequate Communications*

Next, Defendant complains that trial counsel failed to keep him informed of the status of his case. No proof of this allegation was offered at the hearing on the motion for new trial. At the September 29, 1999, hearing, eleven days before trial, Defendant told the trial court that there were between twenty and thirty witnesses whom trial counsel had not yet interviewed, yet Defendant did not specifically name any of those witnesses. Defense counsel told the court that Defendant had been given a copy of every piece of discovery obtained from the State. Defense counsel expressed concern about the fact that witness statements in Defendant's possession were necessarily left inside his jail cell and other people had access to them. The trial court instructed defense counsel to provide Defendant with the witness statements.

Defendant, however, offered no proof at the hearing on the motion for new trial. The only witness to testify at the hearing, who was not interviewed by trial counsel, was Chris Henry, whose testimony would have been inadmissible at trial. Defendant has not shown prejudice.

*Defendant's Failure to Testify*

Defendant complains that he was denied the right to testify at trial. At the hearing on the motion for new trial, Defendant testified that he was confident that the victims and he could "work [things] out." He testified that Michael Snow offered to "take care of" the victims for him, and Defendant told him that was not necessary. Keith Herbstreith also offered to kill the victims, but Defendant did not take him seriously. Defendant testified that he never asked Snow, Herbstreith, or Rocky Harmon to kill the victims for him. He testified that he asked Erik Tanner to find a gun for him because he had applied for a job with the volunteer police department. He did not ask Tanner to find a stolen gun.

On August 2, 1998, Erik Tanner and David Anderson borrowed Defendant's green Ford pickup truck. Defendant drove Anderson's small red car. Defendant went to a picnic for the National Guard. He arrived home from the picnic at around 1:00 p.m. He saw Keith Herbstreith.

Herbstreith and his girlfriend left to go fishing. Defendant did not leave the trailer park for the remainder of the afternoon. Defendant testified that he did not go to Mike Herron's farm in the days preceding the victim's murders.

Defendant testified that he rented a U-haul truck two days before the victims' murders. He rented the truck in order to evade the police, who had a warrant for his arrest for assault. Defendant returned the moving truck the following day because he had acquired enough money to pay a bondsman in the event he was arrested. On his way home that day, he filled his truck with gasoline. Defendant testified that the pump was fast, and the tank filled and sprayed gasoline on the shoes he was wearing.

Defendant also testified that on August 3, 1998, he rented a storage unit. He testified that the reason he rented the storage unit was to store some valuable tools. He abandoned the storage unit on August 9, 2003. He testified that he no longer needed it because his business partner Ken Cox agreed to store the tools. He testified on cross-examination that there were three storage buildings with locks at the trailer park. One of the storage units at the trailer park had been broken into, however, and he rented the storage unit because he believed it to be more secure.

Defendant testified that on the night of the murders, he met Sylvia Campbell at a truck stop. He had known Ms. Campbell from the National Guard. On his way to the truck stop, Defendant stopped at the storage unit to drop off some tools. He left his truck at the truck stop, and he and Campbell drove around to several places together in her car. Later that night, at around 11:00 p.m., they rented a motel room at the truck stop and had sex. Defendant then drove home. When he arrived home, his girlfriend Becky warmed his dinner for him. While Defendant was eating, Erik Tanner, asleep on the couch, woke up and asked what time it was. Defendant looked at the clock on the microwave and told Tanner that it was 1:30 a.m.

Defendant testified that on the day following the murders, he singed his hand while burning trash in a fifty-five gallon drum in his driveway. Defendant learned about the victims' murders from Keith Herbstreith. Agent Kroffsik interviewed Defendant that day. Defendant gave a statement to Agent Kroffsik, but he did not tell him about having gone to the motel with Ms. Campbell the night before. Defendant testified that he had not spoken to Sylvia Campbell since the night of the murders. He was aware, however, that when his lawyers interviewed Ms. Campbell, she stated that she had been with Defendant at 4:00 a.m., which was inconsistent with Becky Lance's testimony that Defendant returned home around 1:30 a.m.

Defendant married Becky on the Saturday following the murders. He testified that he did not marry her in order to prevent her from testifying against him at trial. He testified that he married her because the victims' deaths had a "profound effect" on him and caused him to take "a hard look" at his life and "what [he] really wanted out of [his] life."

Defendant testified at the hearing that he asked trial counsel to prepare him to testify about ten days before his trial began, but he did not remember their response. At that point, Defendant was

reluctant to testify. On the night before the last day of trial, Mr. Nisbet visited Defendant in jail to talk about whether he would testify. Defendant, upset at the way the trial was proceeding, told Mr. Nisbet that he could not testify at that point because he had not been prepared. Mr. Nisbet appeared insulted and left. The next day at trial, the trial court informed Defendant of his right to testify and inquired whether his decision to waive that right was voluntary. Defendant responded that he understood and had decided not to testify. On cross-examination at the hearing on the motion for new trial, Defendant admitted that he never affirmatively asserted his right to testify. At the hearing, Defendant testified that he never said, "Yes, I want to testify." He told his attorneys instead, "You need to get me ready in case I decide to testify." When approached by trial counsel, Defendant believed that it was too late to testify or to prepare to testify.

Investigator Lax testified at the hearing on the motion for new trial that he spoke to Defendant often and he did not remember Defendant ever indicating his desire to testify. On several occasions, Defendant indicated his desire not to testify. Mr. Lax testified that Mr. Nisbet advised Defendant that it was in his best interest not to testify. Mr. Lax met with Defendant several times to discuss the results of his investigation, and he and trial counsel questioned Defendant about the witnesses and events. Defendant became frustrated and often responded that he did not remember. Mr. Lax testified that Defendant was "presentable" and "intelligent," but if he answered questions on the stand in the same manner he answered their questions in preparation for trial, "it would have been a disaster."

In its order denying Defendant's motion for new trial, the trial court found that Defendant fully and freely waived his right to testify under the guidelines set forth in *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999). We conclude that the record does not preponderate against the trial court's finding that Defendant voluntarily waived his right to testify. We also conclude that Defendant has failed to prove by clear and convincing evidence that trial counsel was deficient in failing to prepare him to testify. Furthermore, Defendant has failed to establish that he was prejudiced by his failure to testify at trial.

In summary, Defendant has failed to prove that he was prejudiced by any of trial counsel's alleged deficiencies. As previously noted, a reviewing court need not address whether counsel's performance was deficient if the defendant makes an insufficient showing of prejudice. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699. Defendant is not entitled to relief on this issue.

**Circumstantial Evidence Jury Instruction**

Defendant alleges error in the trial court's refusal to grant Defendant's request for an instruction based on language in *State v. Crawford*, 470 S.W.2d 610 (Tenn. 1971), and in the trial court's failure to charge the jury that circumstantial evidence "should be acted upon with caution." The State argues that the trial court's instruction was adequate. We agree.

A defendant "has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990).

Defendant requested the following jury instruction:

In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone.

To convict a defendant on circumstantial evidence, a web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.

The trial court denied Defendant's special request and charged the jury as follows:

There are two types of evidence. One type of evidence is called direct evidence and the other type is called circumstantial evidence.

Direct evidence is those parts of the testimony admitted in court which referred to what happened and what was testified to by witnesses who saw or heard what happened first hand. If witnesses testified about what they themselves saw or heard, they presented direct evidence.

Circumstantial evidence is all the testimony and exhibits which give you clues about what happened in an indirect way. It consists of all the evidence which is not direct evidence.

Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence. Either type of evidence can prove a fact if it is convincing enough. A defendant may be convicted on direct evidence, circumstantial evidence, or both. When the evidence is entirely circumstantial, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the theory of guilt, and the facts must exclude every other reasonable theory except that of guilt. Before a verdict of guilt is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion and producing in effect a moral certainty that the accused, and no one else, committed the crime.

Defendant argues that the more "poetic language" of the supreme court in *State v. Crawford*, 470 S.W.2d 610, 613 (Tenn. 1971), is a better statement of the law than the jury charge given by the

trial court. The State argues that the trial court's instructions provided the jury with an accurate statement of the law, and therefore, there is no error. We agree.

The instructions given by the trial court were taken from the Tennessee Criminal Pattern Jury Instructions, 42.03, and are accurate statements of the law regarding circumstantial evidence. *See Marable v. State*, 313 S.W.2d 451, 456-57 (Tenn. 1958). Where the trial court's instructions on a matter are proper, its denial of a special request is not error. *State v. Vann*, 976 S.W.2d 93, 114 (Tenn. 1998). Defendant is not entitled to relief on this issue.

Defendant also argues that the trial court erred by failing to include in its instructions to the jury specific language from *Marable v. State*, 313 S.W.2d 451 (Tenn. 1958). In *Marable*, the Tennessee Supreme Court explained that there are four rules by which the evidence is tested in circumstantial cases: (1) the evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. *Id.* at 456. This court has held that the jury is governed by these rules when testing the value of circumstantial evidence. *State v. Knight*, 969 S.W.2d 939, 941-42 (Tenn. Crim. App. 1997).

The trial court instructed the jury as to three of the four rules, but it did not charge the jury that circumstantial evidence "should be acted upon with caution." Although Defendant argued error in the trial court's failure to include this instruction in his motion for new trial, the issue is nevertheless waived because Defendant failed to include the desired instruction in his request to the trial court. Tenn. R. App. P. 36(a); *State v. Bradfield*, 973 S.W.2d 937, 947 (Tenn. Crim. App. 1997).

**Sufficiency of the Evidence**

Defendant contends that the evidence at trial was insufficient to support his convictions for first degree murder, especially aggravated burglary, and arson.

When an accused challenges the sufficiency of the convicting evidence, we must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn. 2000) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979)). In evaluating the sufficiency of the evidence, this court will afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact, not this court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Furthermore, a guilty verdict replaces the presumption of innocence with a presumption of guilt, and the defendant has the burden of demonstrating on appeal why the evidence does not support the jury's findings. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The standard for appellate review is the same whether the conviction is based on direct or circumstantial evidence. Furthermore, circumstantial evidence alone may be sufficient to sustain a conviction "if such evidence sufficiently proves all the necessary elements." *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958).

> The law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime.

*Pruitt v. State*, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970).

A conviction for first degree premeditated murder requires proof beyond a reasonable doubt that Defendant committed a premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (1997). A premeditated act refers to "an act done after the exercise of reflection and judgment." "'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d) (1997). A conviction for arson requires proof beyond a reasonable doubt that Defendant knowingly damaged any structure by means of a fire or explosion. Tenn. Code Ann. § 39-14-301(a) (1997). A conviction for especially aggravated burglary requires proof beyond a reasonable doubt that Defendant committed a burglary of a habitation and the victim suffered serious bodily injury. Tenn. Code Ann. § 39-14-404(a) (1997). A burglary is defined as the unlawful entry of a building with the intent to commit a felony therein. Tenn. Code Ann. § 39-14-402(a)(1) (1997).

The record shows that the victims were seeking to foreclose on Defendant's trailer park. The victims were killed two days prior to a hearing on whether the foreclosure could go forward in light of Defendant having filed for relief in bankruptcy. Although proof of motive is not essential to a conviction for homicide, it allows the jury to infer intent. *Ashby v. State*, 139 S.W. 872 (1911).

Three witnesses testified that prior to the murders, Defendant solicited their help in hiring someone to kill the victims or finding a stolen gun. Defendant gave Michael Snow $2,500 and a letterhead with Victor Kolesnikow's name and address. Rocky Harmon and Keith Herbstreith also testified that Defendant asked them if they knew of anyone who could kill the victims for hire. Viewed in a light most favorable to the State, Defendant intended to kill the victims. The State also proved premeditation beyond a reasonable doubt.

Defendant argues that there was no proof whatever that the gun used to kill the victims ever belonged to or was ever used by Defendant. Three days prior to the murders, Defendant was seen target shooting at the Herron farm. Bullets and shell casings from the Herron farm were matched to a weapon found on the Bohannon farm near the victims' home. Bullets and shell casings from the murder scene and a bullet recovered from the victim's body also matched the same weapon found

on Mr. Bohannon's farm. Erik Tanner and Keith Herbstreith both testified that they recognized the green cord and the black flashlight attached to the gun as having belonged to Defendant. While this evidence is entirely circumstantial, the evidence is sufficient to link the murder weapon to Defendant.

In addition, Joel Brown and Steve Powell discovered two full cans of gasoline at the Herron farm on the evening of the day that Defendant was seen at the property. The gas cans had not been there the day before. The gas cans remained there until the night before the murders. Defendant's shoes and socks were tested for the presence of gasoline, and the test revealed a gasoline range product. Hairs on the backs of Defendant's hands were singed.

Mike Herron alerted Defendant to the investigation when he called to ask Defendant to check on his property. One day before investigators searched the Herron property, Defendant was seen burning wood and dresser drawers, which the jury could reasonably conclude held bullet fragments from Defendant's target practice.

Defendant traveled to Arizona following the murders. Defendant refused to speak to Rocky Harmon on the phone after the murder, believing that his phone was tapped. Defendant warned Harmon not to talk to investigators. When Erik Tanner returned to Tennessee from Arizona, Defendant did not allow him to stay at his home and warned him to avoid the TBI. A reasonable jury could infer guilt from Defendant's actions following the murders.

The evidence was sufficient for any rational trier of fact to conclude beyond a reasonable doubt that Defendant shot and killed the victims inside their home and burned their house. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a careful review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE